## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA
## MOBILE DIVISION

| | |
|---|---|
| KENNETH EVANS, as an individual and as a representative of the class,<br><br>Plaintiff,<br>vs.<br><br>MYLAN PHARMACEUTICALS, INC., AND MYLAN SPECIALTY, L.P.,<br><br>Defendants. | Case No:  1:17-cv-00336<br><br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Kenneth Evans, on behalf of himself and the class set forth below, brings the following class action complaint against defendants Mylan Pharmaceuticals, Inc., and Mylan Specialty, L.P. (collectively "Mylan"):

## PRELIMINARY STATEMENT

1.     This case is about Mylan's scheme to dominate the market and force outrageous price increases for a life-saving emergency medical device.

2.     The case concerns all epinephrine auto-injector devices placed into commerce by Mylan in the past four years including EpiPen®, EpiPen Jr®, EpiPen 2-Pak®, EpiPen Jr. 2-Pak®, My EpiPen®, LIFE HAPPENS®, Be Prepared®, EpiPen4Schools®, and Never-See-Needle® (collectively "Mylan's EpiPen" or "EpiPen").

1

3.    The EpiPen is a self-injecting device that delivers epinephrine to persons experiencing anaphylaxis, a severe and potentially deadly allergic reaction.

4.    In 2007, Mylan acquired exclusive rights to market and sell EpiPens to pharmacies in the United States, and since then has conspired with suppliers, affiliates, and subsidiaries to assert and maintain control over 90 percent of the epinephrine auto-injector market.

5.    From 2007 through 2016, Mylan spearheaded a scheme designed to block and delay entry to cheaper generic epinephrine auto-injectors by abusing its patents, engaging in sham litigation, and paying-off Pharmacy Benefit Managers ("PBMs").[1]

6.    Mylan's anticompetitive conduct was harmful to the very people its EpiPens were created to help. In 2007, Mylan's patients paid a list price of approximately $57 for an EpiPen. By September, 2016, Mylan had increased the list price of an EpiPen two-pack to over $600.

7.    Had Mylan's competitors been able to enter the market and compete with EpiPen in a timely fashion, Mylan's patients would have had lower-priced alternatives to the higher-priced brand name EpiPen and/or would have paid a lower net price for their EpiPen.

---

[1] A PBM typically is a third party administrator of a prescription drug program. The PBM's primary role is processing and paying prescription drug claims.

8.     The plaintiff seeks redress individually, and on behalf of those similarly-situated, for overpayments stemming from Mylan's unfair and deceptive business practices in selling and grossly overpricing EpiPens as described herein.

9.     The plaintiff asserts these claims on behalf of both a proposed class of Alabama purchasers, as set forth in paragraphs 59-71 of this complaint.

10.     The plaintiff and the class seek monetary relief, injunctive relief, corresponding declaratory relief, and other appropriate relief for Mylan's unlawful conduct, as described herein.

## PARTIES

11.     Individual and representative plaintiff Kenneth Evans is a resident and citizen of Mobile County, Alabama.  Plaintiff Evans has used a Mylan EpiPen for approximately ten years to treat anaphylaxis caused by a shellfish allergy.

12.     Most recently, on or about January 23, 2017, plaintiff Evans purchased Mylan's EpiPen 2-Pak, 0.3Mg/0.3Ml, from his local Walmart pharmacy in Mobile County, Alabama.

13.     Defendant Mylan Pharmaceuticals, Inc. ("Mylan Inc."), is a corporation organized under the laws of West Virginia with its principal U.S. place of business located in Canonsburg, Pennsylvania.  Mylan Inc., one of the largest pharmaceutical companies in the world, owns the trademarks on the EpiPen tradenames and has worldwide rights to market and sell EpiPens.  Mylan Inc. conducts business

3

throughout the United States and its territories, including in the State of Alabama.

14. Defendant Mylan Specialty, L.P. ("Mylan Specialty"), is a wholly-owned subsidiary of Mylan Inc. It is a limited partnership organized and existing under the laws of Delaware, with its headquarters in Morgantown, West Virginia. Mylan Specialty is a "specialty pharmaceutical company focused on the development, manufacturing and marketing of prescription drug products for the treatment of respiratory diseases, life-threatening allergic reactions, general anesthesia and psychiatric disorders." Mylan Specialty conducts business throughout the United States and its territories, including in the State of Alabama.

## **JURISDICTION AND VENUE**

15. This Court has original jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5,000,0000 (exclusive of interests and costs), the number of class members exceeds 100, and at least one of the class members is a citizen of a state different from that of the Mylan defendants.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because the plaintiff resides in this district, the Mylan defendants each conduct substantial business in this district, which led to the plaintiff's purchase of Mylan's EpiPens in this district. Furthermore, Mylan has harmed class members residing in this district.

## FACTUAL ALLEGATIONS

### *EpiPens Are Life-Saving Medical Devices*

17.    Mylan's EpiPen is used to treat anaphylaxis in people who are at risk for, or who have a history of, these life-threatening reactions.

18.    Causes of anaphylaxis include insect stings (e.g., bees, wasps, hornets, yellow jackets, fire ants), insect bites, (e.g. mosquitoes), foods (e.g. peanuts and other tree nuts, shellfish, mile, eggs), food additives (e.g., monosodium glutamate and artificial coloring), medications, latex, allergen immunotherapy, diagnostic testing substances (e.g., radiocontrast media), and other allergens, as well as idiopathic anaphylaxis or exercise-induced anaphylaxis. [2]

19.    Anaphylaxis may occur within minutes after exposure and may manifest with one or more of the following symptoms:  flushing, apprehension, syncope, tachycardia, thready or unobtainable pulse associated with a fall in blood pressure, convulsions, vomiting, abdominal cramps, diarrhea, involuntary voiding, wheezing, dyspnea due to laryngeal spasm, pruritus, rashes, urticaria, or angioedema.

---

[2] The Centers for Disease Control estimates that up to 16 million Americans are at risk of experiencing anaphylaxis, which results in approximately 200 fatalities per year in the United States.  The incidence of anaphylaxis has been on the rise, particularly in children.  According to one study, the number of emergency room visits for children suffering from anaphylaxis doubled over the four-year period from April 2011 to April 2015, to over 300,000 per year, with a majority of anaphylactic episodes triggered by food allergies.

20.    Mylan's EpiPen is a spring-loaded injector device containing a measured amount of epinephrine, a non-selective alpha and beta-adrenergic receptor agonist, indicated in the emergency treatment of allergic reactions including anaphylaxis.

21.    Epinephrine is the only recommended first-line treatment for anaphylaxis.

22.    Mylan's EpiPen is intended for immediate administration of epinephrine, including self-administration, in patients experiencing anaphylactic symptoms.

23.    Each Mylan EpiPen contains a single dose of epinephrine for single-use injection designed and marketed to deliver a fixed dose of epinephrine to the patient.

24.    Patients inject Mylan's EpiPen intramuscularly or subcutaneously into the anterolateral aspect of the thigh, through clothing if necessary.

*Mylan Conspires With Suppliers & Manufacturers To Control The EpiPen Market*

25.    EpiPen has been sold in the United States and internationally since 1987, when it first received FDA approval.

26.    In 2007, Mylan acquired worldwide commercialization rights to EpiPen through its acquisition of Merck KGaA's generics business and Dey L.P.

6

27.    Pfizer, Inc. ("Pfizer"), through its subsidiaries King Pharmaceuticals LLC ("King") and Meridian Medical Technologies, Inc. ("Meridian"), is the exclusive supplier of EpiPen to Mylan.[3]

28.    In 2008, Teva Pharmaceuticals ("Teva") attempted to break Mylan's newfound stranglehold on the market by filing an Abbreviated New Drug Application ("ANDA") with the United States Food and Drug Administration ("FDA").[4]

29.    After receiving notice of Teva's ANDA, to protect their EpiPen monopoly, Mylan conspired with Pfizer, Meridian, and King to have Meridian and King file suit against Teva for alleged patent infringement.

30.    On April 26, 2012, King and Teva reached a reverse payment settlement in which Teva agreed to delay entering the market for over three years, until June 22, 2015.[5]    On information and belief, Teva received unjustifiable

---

[3] Prior to Mylan's acquisition, EpiPen was marketed by Dey as part of an agreement with Meridian. Since acquiring the rights to EpiPen, Mylan has purchased its EpiPens exclusively from King (that supplies the generic epinephrine) and King's subsidiary, Meridan (that holds the relevant patents and manufactures the pens).  In October, 2010, Pfizer purchased King (which owned Meridian) and since has been Mylan's sole provider of EpiPens.

[4] An ANDA, as provided by the Hatch-Waxman Act, is an application for approval of a generic drug that possesses the same active ingredient, route of administration, bioequivalence, and other characteristics of an existing brand drug.  The ANDA process allows generic entrants to rely on the brand's safety and effectiveness studies as opposed to undertaking independent clinical studies, thereby avoiding the lengthy and expensive approval process required of a New Drug Application ("NDA").

[5] Reverse payment settlements, also known as "pay-for-delay" settlements, are a kind of agreement that settles patent infringement litigation, in which the company that has brought suit (the patentee) agrees to pay the company it has sued (the alleged infringer) to end the lawsuit and stop challenging

consideration, incentives, and benefits from King in exchange for the agreed-to market entry delay. EpiPen prices more than doubled during the period in which Teva did not enter the market.

31.    The Teva settlement attempted to foreclose all other auto-injector generic competition for the same period. Mylan knew that an agreed-to delay with Teva would be subject to the Hatch-Waxman Act's 180-day exclusivity period.[6] Thus, as a result of Teva's delayed market entry, Mylan delayed all generics seeking ANDA applications based on the EpiPen.

32.    In 2010, Sandoz, Inc. ("Sandoz") made a similar attempt to enter the market through a generic alternative to EpiPen. As with Teva, Mylan conspired to have its supplier, King, file a patent infringement suit against Sandoz in response to its ANDA filing.

33.    The court entered an order staying the FDA process and administratively terminating the action, to be reopened upon letter request by any of

---

the validity of the disputed patent. These agreements are distinct from most patent settlements, which usually involve the alleged infringer paying the patent holder. The United States Supreme Court has held that, in some circumstances, these type settlements violate the antitrust laws. FTC v. Actavis, __ U.S. __, 133 S.Ct. 2223 (2013).

[6] This provision of Hatch-Waxman grants 180 days exclusivity to the first generic to challenge a brand firm's patent, claiming it is invalid or not infringed. The exclusivity period does not begin until the first-filing generic enters the market. In the case of Teva – as the first filer – that would be a minimum of three years in the future.

the parties.  No party has reopened the case.  Sandoz' ANDA application remains stalled as a result.[7]

34.    Intelliject, Inc. ("Intelliject") also tried to compete with EpiPen.[8] Intelliject's Auvi-Q device (initially introduced as "e-cue") differed in size, shape, and operation, using a recorded voice to provide instruction to users.  Rather than pursuing entry through an ANDA, Intelliject filed a "paper NDA."[9]

35.    Mylan again acted quickly to protect its monopoly.  In January, 2011, Mylan again used King to file yet another patent infringement lawsuit – this time suing Intelliject and Sanofi-Aventis U.S., LLC (Auvi-Q's manufacturer) – to block Intelliject's NDA.  After tying Intelliject up in litigation for over a year, the lawsuit settled in February, 2012.  As with Mylan's previous settlement with Teva, however, Intelliject agreed to postpone the introduction of Auvi-Q/e-cue for even longer – until November, 2012.  Thus, Mylan blocked this competitor for almost two years.

36.    In January, 2015, with Teva's market entry looming, Mylan filed a "citizen petition" with the FDA in an effort to further stifle competition from Teva.[10]

---

[7] See King Pharmaceuticals, Inc. v. Sandoz, Inc., No. 10-cv-3568 (D.N.J. May 10, 2011), Dkt. 66.

[8] Intelliject is now known as kaleo, Inc.

[9] A paper NDA differs from an ANDA in a number of ways, one of which is that approval for a paper NDA relies in part on a previously approved product's safety and efficacy data.  Yet the products are different in some way.

[10] The citizen petition is intended for members of the public to raise safety concerns with the FDA but, in this case, was being used by Mylan as an anticompetitive means of continuing to block Teva from competing with them for auto-injector sales.  This is not an uncommon practice by

37.     In May, 2015, however – four months after the petition's filing and weeks before an expected FDA response with that 150-day period – Mylan strategically filed a supplemental study that made questionable, poorly supported assertions that Teva's device could not be operated without patient retraining.[11]

38.     Mylan's actions, including (1) filing a petition years after knowing about Teva's generic, (2) filing a petition calculated to delay entry after settlement, and (3) late-filing a supplemental study, together comprised a strategy to delay Teva's ANDA approval beyond the already delayed but agreed upon entry date of July 22, 2015.

39.     In February, 2016, Teva's ANDA was denied by the FDA. Nevertheless, Mylan could not have known that Teva's application would be denied at the time it began its plan, beginning in 2009, to block Teva from entering the auto-injector market.  Moreover, Mylan's plan did not just block Teva, but all competition from entering the genric epinephrine auto-injector market.

---

brand drug manufacturers.  Such petitions by brand manufacturers "are almost always (92 %) denied" but typically have the effect, absent some intervening event, of impeding market entry efforts of a generic for about 150 days while the FDA considers the petition.  A delay of this length would be significant for Mylan; commentators estimated that "[f]or a billion-dollar drug like the EpiPen, each day of delay mean[s] an extra $3 million."  Michael A. Carrier & Carl J. Minniti III, The Untold EpiPen Story: How Mylan Hiked Prices by Blocking Rivals, 102 Cornell L. Rev. Online at 53, 66 (2017).

[11] Criticisms of the study include that it lacked a control group, did not study the actual generic but a prototype instead, used a small number of participants, failed to provide proper instructions for use, and told participants to watch a video rather than actually use the Teva device.  Carrier & Minniti, 102 Cornell L. Rev. Online at 64-66.

*Mylan Paid Off PBMs To Maintain & Enhance Its Market Dominance*

40.    Over the past decade, Mylan used its market power to achieve exorbitant price increases for EpiPen.  This, of course, led to larger margins on the sale of each EpiPen.  Mylan used these larger margins to influence certain PBMs to exclude competitors from their drug formularies.

41.    For example, on information and belief, in exchange for Mylan's increased rebates and discounts, Express Scripts, a PBM, excluded Auvi-Q from its 2014 Preferred Drug List.  Similarly, another leading PBM, CVS Caremark, removed competitor Adrenaclick from its 2014 drug formulary.  These actions effectively removed these EpiPen alternatives from consumer and end payer choice.

42.    These exclusions had an immediate impact on EpiPen's market share. For example, while Auvi-Q had steadily been gaining market share up to 12 percent in 2013, being added to the exclusion list immediately cut its share to 8 percent in 2014.[12]

43.    In summary, EpiPen's dominant position within PBM formularies is facilitated only by Mylan's monopoly power which enables it to charge consumers

---

[12] Express Scripts spokesman Brian Henry implicitly acknowledged Mylan's rebate strategy in a 2016 interview with NBC News:  "In 2014 and 2015, we [Express Scripts] leveraged the competition between EpiPen and Auvi-Q to earn additional discounts for our clients."  Ben Popken, Industry Insiders Estimate EpiPen Costs No More Than $30, NBC News, Sept. 6, 2016, available at http://www.nbcnews.com/business/consumer/industry-insiders-estimate-epipen-costs-no-more-than-30-n642091.

higher prices for its product. The higher prices yield larger margins, which Mylan then shares with PBMs (which create and control the formularies) in the form of enhanced rebates in exchange for excluding insurance coverage for rival products. This net effect of this scheme is to harm the competitive process by restricting consumer choice.

***Mylan's Illicit Tactics Have Been Rewarded By Outrageous Price Increases***

44.    Since acquiring EpiPen in 2007, Mylan has raised the per-dose list price from approximately $50 per shot to $304. The full list price for a Mylan EpiPen two-pack in now over $600. Mylan's EpiPen product is sold only as a two-pack.

45.    In recent years, the demand for EpiPens has been steadily increasing. In 2015, more than 3.6 million EpiPen prescriptions were written.

46.    Mylan capitalized on increasing demand coupled with its market dominance by raising the price of its life-saving EpiPens 15 times since 2009. A brief history of EpiPen pricing shows:

     * on October 12, 2009, Mylan raised the list price of two EpiPens to $124;

     * in 2010, Mylan stopped making single EpiPens available for sale, providing EpiPens only in two-packs;

     * on October 18, 2011, two years and four price increases later, a Mylan EpiPen two-pack cost consumers $181;

12

* on July 17, 2013, Mylan's EpiPen two-pack cost $265;

* on November 5, 2014, after four more price increases, a Mylan EpiPen two-pack cost $609.

47.    The EpiPen list price remains in excess of $600 ($608.61), representing an increase of more than 548 percent since 2007.

48.    Mylan has stated that it increased EpiPen list prices "to enhance the product and make it more available."  Contrary to this representation, Mylan has not changed the product quality or dose quality, and the drug itself (epinephrine) remains the same.  No supply, distribution, or regulatory factors account for the dramatic price increases.

49.    Mylan's list price increases for its EpiPen products have made the drug more costly and inaccessible to consumers.  According to Forbes, "[E]ven after insurance pays, the customer can be out $400 or more for a pack of two pens, a dollar value that can vary depending on how high the deductible is.  And most customers need EpiPen®s for home and school for their child…."[13]

50.    Moreover, because EpiPens have one of the shortest expiration periods of any drug on the market, these costs must be incurred repeatedly over short periods of time.

_____

[13]http://www.forbes.com/forbes/welcome/?toURL=http://www.forbes.com/sites/emilywillingham/2016/08/21/why-did-mylan-hike-epipen-prices-400-because-they-could/&refUrL=&referrer=

51.    In 2010, 35 percent of prescriptions were for single EpiPens. Nonetheless, Mylan began selling EpiPens only as two-packs, forcing patients to purchase two EpiPens at once whether both were needed or not.  At the same time, Mylan acknowledged that single EpiPens would continue to be available outside the United States, seriously undercutting any claims that double packaging is required for patient safety.

52.    Mylan's EpiPen price hikes were motivated by greed.  Mylan knew that millions of Americans depended on their EpiPen for emergency life-saving treatment.  Mylan exploited this fact, and its market dominance, to raise the EpiPen price to unconscionable levels.

### Mylan's Conduct Has Attracted Great Scrutiny

53.    Mylan's practices with respect to EpiPen pricing have been investigated by federal and state regulators.

54.    In September 2016, Mylan CEO Heather Bresch was called by the United States House of Representatives Committee on Oversight and Government Reform to testify regarding the dramatic EpiPen price increases.

55.    In September 2016, the United States Department of Justice announced an investigation of Mylan's Medicaid drug rebate program following allegations the company improperly classified EpiPen as a generic drug, which provides a lower rebate to state Medicaid programs.

14

56.     Only a few weeks later, in October 2016, Mylan announced it would pay $465 million to the United States for the way it classified EpiPen as generic for Medicaid rebate purposes.

57.     In November 2016, two leaders of the Senate Judiciary Committee called for the Federal Trade Commission to review whether Mylan engaged in anticompetitive practices.

58.     In a letter to Mylan CEO Bresch, Sen. Charles Grassley (R-IA), Sen. Richard Blumenthal (D-CT), and Sen. Amy Klobuchar (D-MN) expressed concerns about Department of Defense payments for EpiPen. [14]

## CLASS ACTION ALLEGATIONS

59.     The plaintiff and the class members, as defined below, have been damaged by Mylan's unfair conduct in that the plaintiff and class mebmers were left with no alternative but to purchase EpiPens at Mylan's grossly inflated list prices.

60.     The plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

61.     The plaintiff asserts his claims herein on behalf of a proposed **Alabama Class** defined as follows:

> All persons who from July 21, 2012, through the date of settlement or judgment of this action, purchased EpiPens in the State

---

[14]https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-grassley-klobuchar-mylan-must-take-immediate-action-to-resolve-overcharging-defense-department-for-epipens

of Alabama for their own use or use by a member of their household, and not for resale. [15]

62.    <u>Numerosity</u>:  The members of the class are so numerous that joinder of all class members is impracticable.  Thousands of persons in Alabama have purchased Mylan's EpiPens during the relevant period.

63.    <u>Typicality</u>:  The plaintiff's claims are typical of other class members because, among other things, all class members were comparably injured by Mylan's unfair pricing practices as described above.

64.    <u>Adequacy</u>: The plaintiff will fairly and adequately protect the interests of the classes, and has retained counsel experienced in class actions and complex litigation, generally.

65.    <u>Commonality and Predominance</u>: Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class, including but not limited to:

a)  whether Mylan's pricing of EpiPens caused substantial injury to consumers;

b)  whether Mylan's pricing of EpiPens offends public policy;

---

[15] The following are excluded from the Alabama Class:  (1) Mylan, any entity or division in which Mylan has a controlling interest, and Mylan's legal representatives, officers, directors, assigns, and successors; (2) the judge to whom this case is assigned and the judge's staff; and (3) governmental entities.  The plaintiff reserves the right to amend the class definition if discovery and further investigation reveal that the class should be expanded, divided into additional subclasses, or modified in any way.

c) whether the plaintiff and class members overpaid for Mylan's EpiPens;

d) the appropriateness and proper form of any declaratory or injunctive relief;

e) the appropriateness and proper measure of restitution; and

f) the appropriateness and proper measure of damages and other monetary relief.

66.    This case is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Mylan has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

67.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the class predominate over any questions affecting only individual members of the class, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

68.    Mylan's conduct as described in this complaint stems from common and uniform policies and practices, resulting in a deliberate and systematic scheme to control the EpiPen market and raise prices for the life-saving product to unconscionable levels.

17

69.    Members of the class do not have an interest in pursuing separate individual actions against Mylan, as the amount of each class member's individual claims are small compared to the expense and burden of individual prosecution.

70.    Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Mylan's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

71.    Plaintiff intends to send notice to all class members to the extent required by Rule 23.

## CLAIM FOR RELIEF UNDER THE ALABAMA DECEPTIVE TRADE PRACTICES ACT

72.    The plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

73.    The Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, et seq., prohibits unfair methods of competition and unfair or deceptive acts or practices.

74.    Mylan's conduct, as described above, in engaging in anticompetitive conduct and leveraging its market dominance to charge unconscionably high prices for lifesaving medication not only is immoral, unethical, and oppressive, but

constitutes an unconscionable, false, misleading, or deceptive act or practice in violation of Ala. Code § 8-19-5 (27).

75.    Mylan's conduct in charging unconscionably high prices for lifesaving EpiPens is so oppressive as to leave the plaintiff and class members with little alternative.

76.    On June 30, 2017, plaintiff Evans, individually and on behalf of the class, provided a written demand to Mylan as required by Ala. Code § 8-19-10 (e). Mylan did not respond to plaintiff Evans prior to the filing of this complaint. [16]

---

[16] While private class actions generally are not permitted under the Alabama Deceptive Trade Practices Act, Ala. Code 8-10-10, such actions are permitted in federal court pursuant to the United States Supreme Court's decision in Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co., 559 U.S. 393, 130 S.Ct. 1431(2010), and the Eleventh Circuit's corresponding decision in Lisk v. Lumber One Wood Preserving, LLC, 792 F.3d 1331 (11th Cir. 2015).

## PRAYER FOR RELIEF

77.     Accordingly, the plaintiff, on behalf of himself and the class, requests relief as follows:

      a)  certification of a class pursuant to Fed. R. Civ. P. 23, as requested herein;

      b)  appointing plaintiff Evans as class representative, and appointing undersigned counsel as class counsel;

      c)  entering a judgment awarding plaintiff Evans and class members actual, compensatory, and exemplary damages to the extent allowed by law;

      d)  entering a judgment awarding plaintiff Evans and class members restitution and disgorgement;

      e)  entering a judgment awarding  plaintiff Evans and class members reasonable attorneys' fees, costs, and expenses; and

      f)  granting such other relief as the court deems just and appropriate.

## DEMAND FOR JURY TRIAL

78.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the plaintiff and the class demand a trial by jury.

Respectfully submitted July 21, 2017.

**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**

*/s/ W. Daniel "Dee" Miles, III*
W. DANIEL "DEE" MILES
ARCHIE I. GRUBB, II
218 Commerce Street
Montgomery, AL 36104
334-269-2343
Dee.Miles@BeasleyAllen.com
Archie.Grubb@BeasleyAllen.com

**BRASWELL MURPHY, LLC**

*/s/ Kasie Braswell*
KASIE M. BRASWELL
D. BRIAN MURPHY
59 St. Joseph Street
Mobile, AL 36602
205-438-7503
kasie@braswellmurphy.com
brian@braswellmurphy.com

**Attorneys for Plaintiffs & Proposed Class**

SERVE DEFENDANTS AS FOLLOWS:

MYLAN PHARMACEUTICALS, INC.
1000 MYLAN BOULEVARD
CANONSBURG, PA 15317

MYLAN SPECIALTY, L.P.
C/O CORPORATION SERVICE CO., INC.
641 S. LAWRENCE STREET
MONTGOMERY, AL 36104